We welcome you out to this special sitting of the Ninth Circuit here in Boise to hear a case that this panel heard once before in Idaho, and we chose to hear it here in Idaho again. Pleased to have Judge Trott at my right, Judge Smith at my left, all members of the Ninth Circuit Court of Appeal to hear this case. We are the panel that heard the case the first time. I call to your attention that in the Ninth Circuit the judges read the briefs and we study the record and we read the important cases, so you won't need to bother in your discussion with us to redo what you've already told us in writing. I'm sure we'll have a few questions for you which I'm confident you'll be prepared to answer. We have time limits. The opening remarks will be by the representatives of the appellates. You have 20 minutes if you wish to have a rebuttal. You may save your time. If you do not, you will not. The City of Boise has chosen to take 10 minutes. Dr. McDonald's attorney will take five minutes, and then St. Luke's five minutes. Okay, if you're prepared, we'll have Mr. Rossman first. You have that timer right in front of you. It'll be working. Thank you, Your Honor. May it please the Court, I'd like to reserve five minutes of my time for rebuttal. There are obviously a large number of issues that we've presented in the papers. I'm happy to answer any questions the Court may have about any of them. In our limited time here this morning, I'd like to focus on three. First, the court below's admission of expert testimony based upon the expert's instinct. Second, the jury instructions provided to the jury in the court below, or at least some of them. And third, some parts of the summary judgment rulings. The court below concluded that Dr. Rosen could testify based upon his clinical instinct, because he concluded that clinical instinct is a reliable methodology. We believe this was an abuse of discretion. Instinct is not a reliable methodology. Instinct... Counsel, aren't you taking it somewhat out of context? Wasn't that presented in the context of the differential diagnosis that the doctor immediately makes when somebody comes into the emergency room? Wasn't that his way of explaining the differential diagnosis and how you identify the possible causes of what the doctor is seeing and decide which ones to treat first? Right, but the differential diagnosis isn't the part of the expert testimony that we're really challenging here. And the court concluded that all of his testimony, including the parts that were challenging, that Paige Mueller had a serious bacterial infection and would have died if not for the treatment that was provided, was based upon clinical instinct. And there was no explanation. Instinct is the absence of an explanation. It's what we say when we don't really have a set of facts to support our conclusion. Well, we may say that, but I'm not sure that that's what doctors say. Well, there is no explanation that's provided either in the court below's opinion or in Dr. McDonald's brief that would support, other than saying I relied on my experience, which under Rule 702 is simply insufficient without an explanation of how that experience led you to the conclusion. Other than that, there's nothing in the record to show what reliable methodology consistent with Rule 702 was used. And we can tell this not only by what Dr. Hilton- If I could stop you, counsel, just a minute. You started out by talking about abuse of discretion. In our court, what does that exactly mean to you? An abuse of discretion, Your Honor, is a clear and firm conviction that the court made a clear error of judgment. And don't I have to find that what the district court did was implausible? I think- Don't I have to find that what the district court did was so out of touch with plausibility that I should get in myself and make that ruling? I would just repeat the words that the court itself has used. It does have to be a clear error of judgment. Judge Clifton, in a recent opinion in U.S. v. Wessons, put it, I think, very nicely. He said that an abuse of discretion standard is deferential, but it doesn't mean that anything goes. So, in other words, since the test under Gobbert would be not the correctness of the conclusion, but the soundness of the methodology, and that, therefore, I'm to look at this as to whether the risk assessment could be made on the doctor's experience, as well as the review of medical records, which is what he testified, then I have to find that to be implausible? You have to do a little more, Your Honor. You have to find that he used a methodology, not merely looking at the records. Something about the records had to have told him. Well, he testified quite a bit about his experience, and he testified that he had years of practice, teaching, work on textbooks, seminars. And then he said his risk assessment was made on that experience, as well as the review of the medical records. That's what he testified, didn't he? Yes, Your Honor. But, again, what we would find that in my book, the district court suggesting that that was okay for admitting that testimony was an implausible excuse. No, Your Honor. What you need to do that it was implausible for Dr. Rosen to conclude that T.H. Mueller had a serious bacterial infection. That's the part of the testimony that we're being challenged. That's the part of the testimony that was extraordinarily prejudicial. And we can tell, again, that he had no methodology for making that conclusion, not only by what he didn't say, that is to say an explanation, but also what he did say. He said, you can't look at a child and tell what the source of the fever is. You have to do a fever workup, page 337 of the excerpts of record. He said, when I asked him his conclusion about serious bacterial infection, can it be proven or disproven? And he said, no, you can't. You can't prove it or disprove it. It's not falsifiable, which is one of the hallmarks of reliability that the Ninth Circuit has repeatedly relied upon. Well, Judge Windmill went through quite an extensive proffer. As you well remember, Dr. Rosen's testimony on many things was excluded. It was not allowed into the jury, and he chose this part to let in. What explanation did he give for differentiating this from the other part of his testimony that he excluded? Well, I mean, I think he just said that Dr. Rosen based his conclusion on his experience, but that's an abuse of discretion. You can't simply say experience without a- Well, Richard, when you're dealing with an expert witness, this is somewhat different, and I know you're familiar with Dr. Rosen's credentials, but they were extensive. Yes, they were. Extremely extensive. Compared to Dr. Shapiro's, for example, who wasn't board certified and not even an emergency room doctor, Dr. Rosen's experience was extensive, and so I think Judge Smith is probably onto something here. As an appellate court, we defer to the judgment of the trial court with respect to the admission of evidence, and especially expert testimony, unless it's just really off the tracks. And it seems to me that it was on the tracks here, but let's assume for the sake of discussion that you're right. The other side says it was harmless. If it was air, it was harmless. What's your answer to that? My answer to that, Your Honor, is that when a doctor, an expert, with all of the experience that you've just identified, long history of experience in emergency medicine, gets on the stand and says this child had a very serious disease and would have died if it weren't for the acts of the defendants, that is just facially and inherently prejudicial. Did you argue to the jury to give no weight to that testimony? Well, we certainly said he was wrong. Isn't that a fair way to address this, to argue to the jury? The jury is the eventual decider of the credibility of a witness and what power or effect to give to evidence, and you argue this isn't worth the breadth with which it was spoken, I'm sure. Or something like that, Your Honor. But, again, the question is it's a disability in the first place. Once it's admitted, it can't be taken back from the jury, and that question is determined by the district court using its authority as a gatekeeper to not only determine whether Dr. Rosen had experience, but to determine whether he had a reliable methodology. And he didn't at any point identify, neither the district court nor Dr. McDonald in his papers in this court, identify a reliable methodology which Dr. Rosen used to conclude that T.H. Mueller actually had a serious bacterial infection and would have died. Isn't that the essence, as I said earlier, though, of an initial differential diagnosis before you even start ordering tests? No, Your Honor. A differential diagnosis tells you what are the possibilities. Dr. Rosen went further. He didn't just say these are the possibilities. He said she had a serious bacterial infection. He eliminated, or at least eliminated the significant possibility of a viral infection, which is one of the other possibilities that you would use in a differential diagnosis. And again, what is the basis for him excluding a viral source of the infection? He didn't have one. Let me briefly talk about the jury instructions, if I may, Your Honor. In Troxell, Your Honor, the court said that there is a presumption that parents act in the best interests of their children and that the state must give weight to this presumption in determining whether or not it can overrule a parent's determination. The court below recognized this. In one of its earlier opinions, on page 113 of the excerpts of record, it said, when fit parents decline medical treatment for their minor child, the due process clause closed them with a presumption that they are acting reasonably. But when we asked him to make such an instruction to the jury, he refused to do it. And what is my standard of review again, Counselor? In this case, Your Honor, because it was an error of law... I don't know whether it was an error of law. I guess I have to determine whether it is, don't I? Yes, that's right. If it's an error of... If it's only a formulation of jury instructions, then the district court has an abuse of discretion standard and I have to review all of the instructions as a whole, don't I? That's correct, Your Honor, but if... If I look at any case, Wallace or any of the cases which followed Wallace, and I look at what kind of instructions are given or what is the law which is supposed to be applied, where do I ever find that presumption in any of the jury instructions or in any of the law in which those cases were set? This court hasn't reviewed many jury instructions in those cases. I appreciate what I've reviewed. I'm just trying to find one. Well, I think it comes from Troxel, though, Your Honor, and it comes from the court below's earlier opinion in the very same case. Has there ever been a case where that instruction was given and discussed by an appellate court? I don't know that it has, Your Honor. That's what Judge Smith is saying, and I couldn't find one either. It may be a case of first impression, but this isn't a qualified immunity question, Your Honor. I've reviewed the instructions and I've looked at all the allegations against Dr. McDonald. What is there... What is missing from the instructions that were given, or what is there that prevented your client from getting a fair hearing by that jury? Well, there was, as I said, the failure to identify the presumption that I just identified, when combined with the conclusion of the court below that we had the burden of demonstrating that Detective Rogers, for example, didn't have a reasonable basis for determining that the child was in imminent danger and didn't have a reasonable... didn't reasonably believe that it was necessary to avert. When those two things are combined, Your Honor, those things prejudiced our case before the jury. And if it's a formatting, a formulation of the instructions, and I can read the instructions and they agree with what I can see in Wallace, on an abusive discretion standard, can I really say there's any problem with the failure to give this instruction? I think you're right, Your Honor. We don't agree that it's an abusive discretion standard. We think the court, especially... Well, I appreciate you don't, but I guess when I get to whether I have to do it in an oval review, I have to have a misstatement of the law. I don't know that I can find a misstatement of the law in what Judge Windmill gave as instruction. He may have misformulated it, which it seems to me is your argument. Then it becomes an abuse. Which side you put the presumption, or the burden, excuse me, which side you put the burden on, Your Honor? That's a straightforward question of law. We're not on burden yet, are we? I thought we were on the failure to instruct the jury about the presumption. Well, I just identified in addition to that the fact that Judge Windmill put the burden on us, on the underlying constitutional question, so I would... The burden of proving the absence of the imminent danger, is that what you're talking about? Yes, that's exactly what I'm talking about. Okay. What cases do we have that put the burden on the government in those types of situations? Well, the Burbank case that we cited in our brief... What are they about? They're about exigent circumstances, Your Honor. Are they about exigent circumstances similar to this? Are they in circumstances where we're entering into real property? It's entering real property, Your Honor, but the court below... In that case, we have plenty of cases which suggest the government would have the burden. Outside of the real property cases, where are the cases which say the government has the burden? There aren't cases in either direction, Your Honor, in imminent danger cases. Frankly, I want to talk to you about... I don't find any cases that suggest outside of the real property cases that the government has the burden at all. And therefore, I don't know how I can say it's an abuse of discretion, or even de novo reviews suggest what Judge Windmill gave the burden to the wrong party. It would be very odd, Your Honor, if for some reason the plaintiffs had the burden when the child steps out of the house, but if the child is in the house and the police come in the house to take the child away from the parents, suddenly in the subsequent case, the government has the burden. However, in Larez v. Holcomb, 1994 case in our court, regarding voluntary consent in the 1983 action, the burden was on the plaintiff. In the Gilker v. Baker case, 1978 case, regarding illegal arrest, the burden was on the plaintiff. In other words, outside of the real property, the burden's been on the plaintiff. So I hope that you'd explain that. Why would I say that for de novo review I'm going to change the burden in this case? I think because it's most analogous to the exigent circumstances case. That's all I can tell you, Your Honor. What are you asking us to do with Detective Rogers? What am I asking to do? Yes. I'm asking you to reverse the grant of summary judgment with respect to him. The summary judgment was on the basis of qualified immunity? Correct. And do then what? Well, we would have to have a trial if there's no summary judgment. And how is that going to work, given what's already happened? Well, there has been no judgment as to whether or not Detective Rogers violated the law or violated clearly established laws, so there would have to be a trial on that question. You brought to the court a conspiracy. What was the conspiracy that you say existed? Well, first let me point out that even with Detective Rogers' liability is Counsel, I asked you a question. The conspiracy, Your Honor, was between Dr. McDonald and Detective Rogers to act in a way that violated the Mueller's family rights. And when did that conspiracy begin? Shortly before 1.40 a.m. on By the way, you said a conspiracy. I think what we said is that they engaged in joint action and that Dr. McDonald engaged in joint action with the officers. All right, so they plotted together. They engaged in joint action. I think it's consistent with And exactly when did that conspiracy or that plot or joint action begin? The joint action began sometime around 1.30 a.m. or so on the night of August 12, 2002. Describe exactly what happened that you say created this joint action that's cognizable in a court. Well, there was a decision to take Paige Mueller away from her mother despite the fact that she was not in imminent danger and despite the fact that it wasn't reasonably necessary to do so. Now, if I read this record correctly, Dr. McDonald was telling Detective Rogers at the time that he believed that the child was possibly in danger of having meningitis and it needed to be treated immediately. Is that right or wrong? That's one of the interpretations of the evidence. I don't think it's the interpretation of the evidence that's most favorable to our side. All right, well, let's go back for a second. This whole thing started when Carissa and Eric called their naturopathic physician in the evening because of symptoms that the child was showing. Am I right? That's correct, Your Honor. And what did the naturopathic physician tell the Rogers family about the possibilities that their daughter might have? You mean the Mueller family, Your Honor? The Mueller family. It was possible that they had a virus, possible that it had bacteria. Did the doctor mention meningitis? I don't remember, Your Honor. What was the doctor's recommendation to the family? I believe she suggested that they take the child into the hospital or some other place. She said the emergency room. I believe that's right. Because of the possibility of serious disease. I think that's right, yes. And the way I read the record is that Mrs. Mueller and her husband conferred, and they thought that would be the safe thing to do. Am I right? Yes, Your Honor. So they took the child roughly at 10 o'clock at night into the emergency room. That's approximately right, yes, Your Honor. Dr. McDonald ran through a workup and adhered to the existing standard of care. The way I read the record, you stipulated that the standard of care under those circumstances would involve a lumbar puncture and the administration of antibiotics. Is that right? No, Your Honor. We said recommending those things would be within the standard of care. Well, okay. And so that's exactly what Dr. McDonald did. He recommended those things. And the question in this case is whether he could do it without the parents' consent. Hold on a second. He did that. Excuse me? He did that, and Mrs. Mueller said, no, I don't want it done. Now, then Dr. McDonald consulted a board-certified pediatric doctor there, Dr. Womack, and she agreed with Dr. McDonald. Is that right, too? That's my understanding, yes, Your Honor. And she suggested to Dr. McDonald that if the parent continued to refuse that approach, that he consider contacting the social worker because of the law in place that required the reporting of this to Child Protective Service in the case of medical neglect. Is that right also? Yes, all of that's true, Your Honor, except you're omitting the... Well, I know everything that happened. I read this twice. But what I'm getting at is, with respect to Detective Rogers, is now you have a detective who's called upon by law to make this decision. He's sitting there listening to what Dr. McDonald is telling him, and he's listening to Mrs. Mueller. And Eric Mueller even said in his deposition testimony he thought it was reasonable for the detective to accept Dr. McDonald's opinion over that of his wife, who was an engineer. Now, it seems to me that you're trying to visit on Detective Rogers possibly a medical error made by a doctor. But how is it that Detective Rogers, faced with a dispute between a mother and a doctor, with the doctor saying this is what I recommend? And I underscore here that the way Detective Rogers described this, Dr. McDonald was not pressing the point. He was not urging it. He was simply relating the facts. So tell me how Detective Rogers gets in the middle of a joint action falsely to make a report and deprive your clients of the custody of their child. Well, let's start with even if the child was in imminent danger, Your Honor. Detective Rogers had to reasonably believe that it was necessary, reasonably necessary, for him to act in the fashion that he did, without having notice in a hearing, in order to save the child. In fact, what Detective Rogers told this court on the last appeal, is that he had no idea what would happen once he concluded that the child was in imminent danger. He made a big point out of that. I simply don't understand it. He's not a medical doctor. He had no idea what the State Department of Health and Welfare would do. He had no idea whether calling... He's not part of Child Protective Services or HMW. His job is to make that decision. Rightly or wrongly, the Idaho law says you don't need to go to a... for a court hearing. And he didn't. Well, but all the law that requires him to report in his judgment, and the law doesn't require him to go to a judge. So I still don't get how he becomes liable for what you said. Because the Constitution requires that there be notice in a hearing. Detective Rogers is responsible for the United States Constitution, not just state law. Well, you've attacked the statute, but you didn't bring that to us as an issue. It appears in your reply brief. And even if that's the case, it certainly wasn't clearly established at the time for the purpose of qualified immunity that that's what the Constitution required, to lose unqualified immunity. With all due respect, I disagree, Your Honor. I think the Constitution was clear that in order to take a child into custody without notice in a hearing, it has to be reasonably necessary to avert. That is to say, the acts that you take must be reasonably necessary in order to take the imminent danger away. In this case... And you had two doctors, one a board-certified pediatrician, recommending that this is the course that must be taken. And I still don't see how all of a sudden Detective Rogers becomes a tortfeasor or a constitutional malefactor under those circumstances. Again, to repeat myself, and I'll be quiet, you're trying to visit on the detective a possible mistake made by a doctor. And it doesn't seem to me that... It seems to me that's precisely what Malley v. Briggs and Anderson v. Creighton say we shall not do. It doesn't seem to me that Detective Rogers was either incompetent or knowingly violating the law. As you know, the doctrine of qualified immunity makes room for mistakes. Of course, Your Honor. So how do you get around that? Your Honor, Detective... Dr. McDonald couldn't make a legal judgment. He could make a medical judgment. Detective Rogers had to take the facts that were given to him by Dr. McDonald and conclude first that the child was in imminent danger. And for the reasons that we've said in my brief, what Dr. McDonald told Detective Rogers, if they're interpreted in a way that's favorable to our side, just wasn't imminent danger. He's got to make a legal determination second that there's no time to call a judge and that calling a judge would be slower than doing what he actually did. Or... You have the benefit of hindsight, which is usually quite clear. And I did notice Dr. Shapiro testified about a lot of cases wherein he was involved, where the lawsuit was about the failure to detect or diagnose meningitis. So it seems to me that had Dr. McDonald just not even brought up the lumbar puncture or antibiotics and the child had meningitis, he would have been looking at a lawsuit for failure to diagnose. This is the problem they're in. It's really easy for us, especially in a courtroom eight years later, to talk about these things. But when you look at this at 1 o'clock in the middle of the night, in an emergency room with a detective confronted by doctors and an upset woman, it seems to me precisely that that is what qualified immunity is made for. Well, it's true, Your Honor, only if Detective Rogers actually had a reasonable basis for concluding by doing what he would do, doing what he did, the child would be treated. And by his own words to this court, he didn't. It seems that everybody had the same concern. The naturopathic physician was concerned about the possibility of a bacterial infection go to the emergency room. The mother was concerned about the same thing. Eric was concerned about the same thing. Dr. McDonald was concerned about the same thing. Dr. Womack was concerned about the same thing. Detective Rogers was concerned about the same thing. That's why they were asking. Concede, this may be a mistake in judgment. But Detective Rogers said he was most concerned when the temperature went up. That was exactly the point in time when Carissa Mueller was concerned and he prevented her from engaging in any kind of further consultation for their natural health. That's another point. Detective Rogers did not act precipitously. He said he testified that he waited. He was going to allow the discharge to go ahead without calling Child Protective Services, and it was precisely because the temperature spiked that he made the decision, not because Dr. McDonald came to him ranting and raving, but because the temperature spiked, which you all agree happened, which is a precipitating action that triggered Child Protective Services' entry into the case. Well, the question at that point, though, is whether it's, again, reasonably necessary to avert. Carissa Mueller wanted to talk to her naturopathic physician, wanted to talk to her husband right at that point in time, and Detective Rogers stood in her way and refused to allow her to use the telephone. So the question of reasonably necessary to avert, it seems to me, was a jury question. Detective Rogers could have just allowed Mrs. Mueller to make the phone call, then determine whether it was necessary to avert, and then act if he wanted. But he didn't. He blocked her from her path and prevented her from making a decision which the Constitution rightfully places in her. Could I just slip in here? Go ahead. You're going to tell me how much over my time I am? I understand. When you give us eight volumes of excerpts, we tend to read them. I just want to go back to one question that you were raising, and that pertains to whether this clearly established constitutional right, I take it that you rely upon Wallace, the other spelling of Wallace, for that determination. Is that correct? That's correct. It was N. Rogers v. San Joaquin which concluded that Wallace had identified clearly established laws for what imminent danger was. The case was considerably after when this event took place. But the events in question were before. This was the case that was one year before what took place here. And so the question in my mind is whether Wallace really clearly establishes a constitutional right. And what I mean by that is that as I read Wallace and read the dissent, the very excellent dissent by Judge Reimer, that clearly this was dicta. It was just off the wall, or as she put it, out of the ballpark. If, in fact, it's clearly dicta, is that establishing a clearly established constitutional right, that is, this dicta, with no analysis, no application, the only citation for that statement is a nurse's journal, is that clearly established constitutional right that binds the detective in this case? Let me say several things. First of all, Your Honor, even if Wallace wasn't clearly established, maybe was decided before the events in this case and would have established clearly, would have created clearly established law. Second, every court that has concluded, has looked back at Wallace, Doe v. Levos, Rogers v. San Joaquin, all of these cases have concluded that Wallace clearly established law at the time that it was decided and clearly established. I understand what you're saying, but what we're talking about is, is there a clearly established law at the time the detective makes this determination? If he went to his lawyer, he went to me and I was his lawyer, I would look at that case and say, A, it's dicta, B, the parties never raised the issue, C, there's no analysis, D, there's no application, it's just plain nothing, it doesn't stand for anything. So why does that become in the clearly established law? I understand later on the cases have said it's good law, but we're talking about what happened in 1992 with the case that came out in 1991. Why, for this case's purposes, that is, what would this detective, what is this detective charged with as to the Constitution? How would this case, which at that time was clearly dicta and had no application, no authority, how does that charge the detective? Let me again make two answers, Your Honor. First, I don't agree that it was dicta, and every court that has looked back at Wallace since then has concluded that it was in fact a holding. No, I just said that's the law. No one has ever said that that wasn't dicta. Well, I guess, Your Honor, saying that it was the law is sort of saying that it's not dicta. See, the point is, that's what some judges say later. The point is, at that time, does it bind the detective? At that time, not what happens subsequently. And the second point, of course, is that maybe it was decided before the events in question here. So even if Wallace was dicta, it wouldn't matter at all, because clearly established law developed a two-part test that was set forth in Wallace prior to the time that the events in this case occurred. So then Rogers, we don't have to look at, because it was later, because you're suggesting maybe it makes Wallace the law? I think Wallace is instructive because it looks back at Wallace, and maybe, and I forgot the third case. I didn't understand. You said Wallace is instructive? Are you talking about Rogers? Oh, I'm sorry, Your Honor. You're absolutely right. I meant Rogers versus San Joaquin. Rogers was decided after the case, for sure. Definitely decided after the case, Your Honor, but it relied on both Wallace and maybe as establishing the law in the year 2001 when the events in question during Rogers took place. You know, the reason why this is important, because the question of clearly established has to do with fair notice to the officer making the discretionary decision. Precisely. And if an officer does not have fair notice by clearly established law, that officer is not knowingly violating the law. That's why this is important. And you think the state of the law was such at the time that a reasonable officer anywhere in the Ninth Circuit would have knowingly violated the law by doing what Detective Rogers did? Yes, I do, Your Honor. Let me ask you one more question. What damages are you seeking for Carissa Mueller? We have, I mean, we're looking to have the jury verdict overturned. On the basis of what are you looking for? Emotional distress, Your Honor. What emotional distress? What emotional distress? The distress from having her child. Well, let me listen. First, her child was taken from her. She was unable to make medical decisions for her child. Decisions were made that she was concerned about. And fourth, maybe most importantly, I haven't mentioned it up until now, she was precluded from being with her child during the time that – I'm sorry. You're talking about that short time frame between where she was separated from her child and during the treatment? That's certainly – I'm not going to say that's the only time of emotional – On the basis of it. That's the most important. What's the emotional distress that she manifested during that time that entitles her to damages? There was evidence submitted at trial. She went to a counselor and had various emotional problems, sleeplessness, things like that. At the time, what was she doing during that separation? Her husband describes her as hysterically crying. Is that right? I don't remember the testimony, Your Honor, but I'll take your word for that. That sounds right. Doesn't this explain why it was not an unreasonable seizure to temporarily separate the mother from the child, as Judge Windmill said, to maintain hospital order and to make sure that there would be no interference with the procedures that CPS had just authorized? Well, I think there are several questions there. First, don't forget she was taken to a small five-by-seven room. Judge Windmill never identified why it was necessary. Separation, let's leave that issue aside for a second. She was also taken to a specific room. She was also told she couldn't use a telephone, and the excuse or rationale that's used now is that the officers were concerned that she might use it as a weapon against them, rather larger officers. To me, this is the classic identification of an issue that should have gone to a jury. We have two officers saying, I was concerned about this woman, much smaller than us, using a telephone cord as a weapon against us. Do you think the law required under those circumstances with the mother, understandably, understandably hysterically crying, do you think the law required that she be allowed to be in the room while the doctor is performing tests that she objected to? Well, two questions, Your Honor. First, well, three points, I guess. First, she disputes that she was hysterically crying in that room. Second, what we're talking about right now is her Fourth Amendment confinement. Even if it's the case that they were entitled to keep her away from the room in which her child was being treated, it's not the case that she had to be kept in a five-by-seven room. Have you been in that room? Me, personally, no. Well, how do you know it's a nasty room? I mean, should she have been left in the hall with all the other patients? HIPAA requires privacy, especially if your client is upset. Well, I guess that's right, Your Honor, but the question is whether or not this is a Fourth Amendment issue. She was confined against her will. She was free to leave the hospital by her own testimony. She wasn't free to leave the hospital. She had a nursing infant, Your Honor. They told her she could leave the hospital. Exactly. Well, that's not the same thing as actually being free. If you have a nursing infant a little wiser way, you're actually not free to leave the hospital, and that in and of itself would have been, in my view, a Fourth Amendment violation. But they did more. I think maybe we've carried the argument about as far as we can take it. And we've given you an extra 15 minutes. You have, Your Honor. A few minutes for rebuttal. Let's hear from the opposition. Thank you so much, Your Honor. May it please the Court, Counsel, my name is Kirtland Naylor. I represent the Boise City defendants. In this case, let me just begin by saying that if the jury instructions are acceptable, then it's my understanding that the qualified immunity motion for summary judgment issues would be resolved in favor of the city. I think as Judge Trott adequately pointed out, that if the qualified immunity is somehow reversed by this court, we're back to court in front of a jury with instruction to the jury to find that the determination by Detective Rogers was not reasonable. They've already made that determination. Well, if the whole case goes back, if the other side is correct that Dr. Rosen's testimony shouldn't have been allowed in and it's prejudicial, the whole case may go back, in which case your current argument just failed. Well... Am I right? I mean, if the whole case goes back, what you just said is irrelevant. Well, if the jury instruction and the determination by the jury is reversed, that's correct. That's right. That's correct. And they're asking us to reverse the whole case and send it back. Well, and I take issue with that, Your Honor. I believe that qualified immunity is determined early on in the case to avoid litigation. And in this particular case, the determination by the judge, by Judge Windmill, that the law was not clearly established at the time that this occurred, gave Detective Rogers qualified immunity. The Wallace decision, as the court has pointed out, was not clearly established. In fact, Judge Windmill even said so in his decision, that he was making this as a first impression and had not actually seen Wallace interpreted that way at that time. So for all of those reasons, we believe that the determination of imminent danger... Did Judge Windmill determine that there was no violation of a constitutional right, or did Judge Windmill decide that it wasn't clearly established? I believe, Judge Smith, that what he found was that it was not clearly established, but that there was a question of fact as to whether or not Detective Rogers' determination was reasonable under the circumstances. And that's what... I didn't quite follow that. If, in fact, it's not clearly established, you don't have to get to whether or not there was a reasonable decision that was made by the detective at the time. And I see what... It seemed to me what Judge Windmill was saying. There may be an issue here, but there's no issue on the second point. And he determined that under the circumstances there, there was clearly a reasonable decision made by the detective. It seems to me he kind of skipped over the first. I didn't realize, and I'd have to reread it, that he made a determination that Wallace doesn't establish clearly a constitutional right at that time for whatever reason. And I've already indicated there's some questions involved with that. But I thought what he was saying is that the Supreme Court now, although they didn't earlier, the Supreme Court now lets us go to the second issue and not make the constitutional determination and just determine on the basis of rationality, reasonable decision-making. Is that what Judge Windmill did? Yes, I believe so. And later with the Pearson case, I believe that the Supreme Court said you can skip over the saussure two-prong. If, in fact, there's no constitutional right, that ends the question. That's correct. If, in fact, there is a constitutional right, then you have to defend on the basis of a reasonable decision, which we've been discussing now for an hour. Yes. What's the excerpt of record site to which you're referring when you talk about Judge Windmill's You don't have it immediately with you? I've got it in here. I just don't have the page. If it's going to take you time, I read it too, but I'll go back and find it later. Okay, I can provide that. To go to the determination of imminent danger by Detective Rogers, this court in Mueller 1 in the first appeal said, and I believe that the trial bore this out, there is not a scintilla of evidence in the record to suggest that Detective Rogers made his decision for any reason other than his informed perception of the best welfare of both the mother and the child. Based upon all of the factors and the circumstances that he had available to him at that time, a reasonable officer under those circumstances would have found that the child was not only in danger of serious harm, but that action had to be taken to avert any such harm. Counsel makes a significant issue with an argument that they take out of context in a briefing that Rogers didn't know for sure exactly what the Department of Health and Welfare was going to do once custody was transferred. That's true, because as this court pointed out in Mueller 1, once the declaration occurred, custody immediately transferred to the Department of Health and Welfare. So while Detective Rogers had been informed by medical staff that the recommended medical treatment that should occur, he had no control over exactly what the Department of Health and Welfare would have allowed, or whether the circumstances might have changed after that for the doctors to provide additional or different treatment. So I think it's ingenuous to try and split those hairs. As far as the jury instruction, I think that if the jury instructions are reviewed for an abuse of discretion and won't be reversed unless more than harmless errors have occurred, then considering all of the jury instructions in this particular case, Judge Windmill adequately instructed the law as well as informed the jury of what their responsibilities were. Let's go to the failure to train claim counselor. Let's think about that. What is my burden on determining whether I allow the jury to think about a What do I have to look at? What's Judge Windmill looking at? How do I review it? I review it de novo, don't I? That's correct. And so if I review it de novo and we're on a failure to train case, and we have in the record police reports that are similar to this particular situation, not the circumstances, but as far as training of the officers, why don't I under Gibson need to send that to the jury? Because in this particular... Gibson says this is a jury question. Well, then the judge has to determine, which it did, that no reasonable jury would be able to find that there was a failure to train. In this context specifically, two of those incidents occurred in 2003 after this incident. So there would be no relevance to those incidents. The other one was a three-month infant with a breathing monitor that her mother turned off because it interrupted her sleep while she was using marijuana and meth. Do I look at the incidents themselves? Do I look at the issue of the police report? Or what am I really looking at if I'm district judge de novo, whether I send this to the jury? Well, Judge Smith, I believe that you'd look at the circumstances and the notice that the city of Boise was put on as to whether their policy, practice, or custom was a constitutional violation, or that it was a motivating force in creating a constitutional violation. And there was no such constitutional violation. The police reports put the city on notice that there may be a violation. Are you suggesting that they could? No. I don't believe these police reports because unless... I'm not talking about these police. Do you believe that police reports in and of themselves could put the city on notice of a potential violation? Only if on the face of the report there is clear and a constitutional violation. Likewise, there was no citizen complaints, no lawsuits, no indication to alert or communicate to the city that they had to alter or change their training procedures, which is a requirement for the court to make that determination that there was an unconstitutional policy. With regard to the seizure allegations of Ms. Mueller, it is well established in the record that she was hysterical. And this room that has been alluded to was an effort for the police officers to keep Page, frankly, safe as well as the circumstances in the hospital. After Ms. Mueller was allowed to go to the lobby or went to the lobby, she immediately went to the ER room and confronted Detective Rogers. So I believe that under the circumstances, while her detention may have been an inconvenience, it was not unreasonable under the Constitution, which is the standard. The length of detention, as the record reflects, in the Mueller's appeal brief at page 16, they say that she was confined in the room at least an hour. And 21 pages later, in page 37, they say for over an hour. In her deposition three years after the event, she said that it was 10 to 15 minutes. But after her take-home errata change sheet for her deposition, she said, I'm not sure it could have been as long as 30 to 45 minutes. Judge Windmill gave her the benefit of that change in testimony and analyzed that 30 to 45 minutes was reasonable under the circumstances. You've run past your 10 minutes. We'll give you another minute or two if your colleagues don't mind. I wouldn't take time from colleagues. I've experienced that in Bonk. Thank you, Your Honors. Thank you. May it please the Court, I am Rich Hall, and I have had the honor and the privilege of representing Dr. Richard McDonald in this lawsuit. I'd like to begin by talking about Dr. Rosen's testimony because that was the issue that was raised by Mr. Rossman. This case goes directly to the essence and the core of emergency medicine. This was a circumstance that was presented to Dr. McDonald involving a five-week-old child, a five-week-old child that could not say anything about her condition, that could not make any decisions for herself. When she presented to the hospital, Dr. McDonald became responsible for that five-week-old child. The child had conditions and symptoms that were indicative that this could be a case in which the child was developing a dreaded disease, meningitis. I've tried these cases for 40 years for doctors, not exactly this same kind of case, but I can tell you I've seen the other side. I've seen the cases where there are allegations that the doctor did not anticipate or discover the fact that there may be a developing infection, that the doctor did not treat for the infection and do a lumbar puncture and administer antibiotics, or that the doctor didn't do it quickly enough because time is of the essence. In this case, what Dr. McDonald did, everybody has said, was consistent with the standard of care. Not only was it consistent with the standard of care for him to want to do a lumbar puncture and to administer antibiotics to prevent the development of meningitis, but he also consulted with Dr. Womack, the pediatrician. She agreed that that was exactly what needed to be done. Dr. McDonald is a board-certified emergency room physician. And those circumstances that he was presented with that night where the patient's mother said, I will not allow you to do those tests, placed a tremendous burden on him. He had a duty to report child abuse. He did that. He followed the procedures that were set forth to try and alleviate this tremendously dangerous condition that this child was confronted with. All of this is true, but how does that affect Dr. Rosen's testimony, which the other side says, notwithstanding his incredible credentials, he plucked out of the air with no methodology or no support at all. How do you put your answer to that? And based it all on clinical instinct, quote. And I'm getting to that. Thank you for jumping me there. The clock. The clock's running. I've only got 20 and a half left. We know what you just said. Okay. All right. Dr. Rosen's testimony was admissible because of the fact that it went specifically to this issue of emergency medicine that I'm talking about. It went to what was taking place here, a differential diagnosis of this child's condition. And Dr. Rosen's credentials, which you have read about in the brief, indicate he's been doing this for 50 years. He's written textbooks on emergency medicine. He's trained emergency medicine physicians to do a differential diagnosis. And the difference with emergency medicine is that they have to act on the basis of that type of differential diagnosis. And what he was asked to do in this case, in the opinion that he was rendering, with regard to what he thought might have been taking place with Paige, was the same analysis, the same type of consideration that he does in every emergency medicine case of his own. But didn't he go beyond that and say, in his opinion, she had meningitis and the administration of these antibiotics saved her, notwithstanding the results of the Lombard test? Didn't he go beyond that? Basically what he said, that in his medical judgment, he believed that she very well may have had a bacterial infection. What support at all is there for that in the record? The support is the fact that, first of all, he has the qualifications to render that type of an opinion. If you disagree with that opinion, then you have the right to cross-examine him. You have the right to call other witnesses. I'm repeating because I'm listening to this in my own head. That's the appropriate opinion that can be solicited from him. That is one of the opinions that can be solicited from him. It's based on the same reasoning that goes into making a differential diagnosis. Does that also go in terms of relevance to whether there was an exaggeration by Dr. McDonald? If there's an exaggeration, it's up to the plaintiffs to show, once he's qualified, once his testimony is admissible, which we believe it was, whether it's an exaggeration goes to the weight of that testimony, to the credibility of that testimony. The plaintiffs had ample opportunity to challenge that. They cross-examined him. They had called Dr. Shapiro before him. They called Dr. Shapiro back after him. And Dr. Shapiro testified that he didn't agree with what Dr. Rosen was saying. They had a full opportunity to meet the weight of that testimony. And it was admissible because it went directly to the differential diagnosis issue. That's why. Didn't the district court say that the expert opinion had been revealed as shaky by the testimony of Dr. Shapiro? There was a case in which there had been the Permiano case, which had mentioned the fact that even a shaky opinion, once it's deemed to be admissible, is allowable. And that, you know, it's up to, in those circumstances, it's up to the opposing party to demonstrate by cross-examination by other witnesses that it is a shaky opinion, if it is, in fact, a shaky opinion. So once you get it over the threshold, it's up to the lawyers and the jury to battle it out. Yes, once you have qualified the expert witness to testify and it has been deemed to be relevant testimony for the issues in that case, yes, it's up to them. So your answer is to the plaintiff's attorney is that it goes to weight and not to admissibility? Correct. Okay, thank you very much, counsel. I have one question. What if you are wrong and we should determine that that was a mistake? The other side says it was necessarily harmful and prejudicial. Do you have an answer to that? Assuming, for the sake of discussion, that we decide that Dr. Rosen's testimony on that issue should not have been let in, was it harmless? I don't believe it. Once again, it goes to the weight because they have the opportunity to rebut it in every way possible. I don't think there's any way you can say that it would have changed the result in the case if it had not been admissible. They challenged it. They had Dr. Shapiro there to challenge it. And I think that because of that, the fact that it was admitted, and if it had not been admitted, would it have changed the outcome of the case? I don't believe so. Thank you. Thank you. Thank you, counsel. We'll hear from the hospital. May it please the Court, I'm Christopher Kuser representing St. Luke's Regional Medical Center. If you're going to keep your voice up, please. Yes, I'm sorry. I'm Christopher Kuser representing St. Luke's Regional Medical Center. And unless you have questions, I'd like to address the constitutional claims that the plaintiffs alleged against St. Luke's. Judge Windmill addressed those questions by looking at whether or not St. Luke's conduct could cause the constitutional violations that the plaintiffs alleged in the complaint. Your argument is that St. Luke's is not a state actor and there was no policy. All they were doing was following state law. Is that right? Correct. Correct. And the district court looked at both of those issues. It looked at whether or not the policy that St. Luke's had could result in a constitutional violation. And it also looked at whether or not St. Luke's had a policy that required its physicians to act under the color of law, to more or less assume state functions. And those, of course, are the key elements of Section 1983 liability. And the district court found that the plaintiffs could not plead sufficient facts to establish either one of those elements and it could not cure those failures in a complaint. And in our brief, what we've argued, among other things, is there's no reason for the court to address the merits of the district court's decision on appeal. Again, by addressing each of those individual elements of Section 1983 liability, the court dismissed the constitutional claims on two independent grounds. In the plaintiff's brief on appeal, they only have appealed the second reason for Judge Windmill's decision, that being whether or not there was a policy that required physicians to act under the color of law. They have not appealed the first ground related to whether or not there was a policy that resulted in a constitutional violation. And for that reason, we believe that they've waived this issue on appeal. In addition, we point out that for St. Luke's to have an unconstitutional policy, there has to be some implementation of that policy that violated the plaintiff's constitutional rights. And I know that one of the issues on appeal is whether or not Dr. McDonald violated the constitutional rights. And the jury found that he did not. If the court were to affirm that holding of the jury and determine that Dr. McDonald did not violate any constitutional rights, then neither can St. Luke's. You're referring to the special verdict form where the jury is asked whether he knowingly created a false report and the answer is no? Correct. Correct, Your Honor. Well, can't we also look at Bob Comden's work, action? I think you're referring to the social worker at St. Luke's. Yes. I mean, you could argue, and many malpractice lawyers do, that the doctor is his own agent and therefore he isn't under St. Luke's. I've heard that argument made. Maybe even made it a couple of times myself. But my worry is Bob Comden. Bob Comden is St. Luke's social worker. Yes, that's correct, Your Honor. Bob Comden contacted April Ocker, right? And then contacted the police officers. So tell me, why didn't Judge Windmill let at least the 83 claims against St. Luke's either be amended or do something about that? Judge Windmill was looking at whether or not St. Luke's had a policy that could then result in the constitutional violations. Well, the policy Comden said he was following, didn't he? Yes, he did. And the policy he was following was a policy to report, which is required under the law. And that in and of itself does not constitute a constitutional violation. He is just merely reporting as he is required under the law. And for the constitutional violations to occur that have been alleged in the complaint, there has to be something more. There has to be other parties involved. And here, as alleged in the complaint, what had to happen was Detective Rogers had to come in and declare the child in shelter care to temporarily suspend the parental rights. And then the state had to come in and then consent to the medical treatment. So those two kind of intervening steps had to happen before you could ever get to a constitutional violation. I think what Judge Windmill was focusing on was the fact that any St. Luke's policy just couldn't get you there. It couldn't get to the constitutional violation. Was there any policy that prevented Mr. Comden from contacting the judge? I believe the testimony at trial there was not, Your Honor. Under the law, I think the way the testimony came out at trial, under the law, Mr. Comden had the option to inform law enforcement or the state, the social worker at the state. Under the statute, I think the statute makes it clear that a doctor can also, I guess, ask a court, a magistrate judge or a district judge. But in this case, what Mr. Comden did was contact law enforcement and the state. So, again, we believe that just based on this disconnect between what any St. Luke's policy could be and the constitutional violations that were alleged, you don't get the result of a constitutional violation, and you also do not get St. Luke's acting under the color of state law. Okay. Thank you, counsel. Mr. Frozen, we ran you way over, but we'll give you a couple minutes if there's something you're dying to tell us. But before you get that chance, I have a question. What do we do with the subpoena Ducey's take-him issue? There's nobody here from the Ada County Prosecutor's Office. From what I understand, you subpoenaed a file and some people from the Ada County Prosecutor's Office. You know what I'm talking about. Yes, I do. The file was turned over to the court, according to them. Is it in our record in a sealed form somehow? I don't believe so, Your Honor. I couldn't find it. The issue on appeal is whether they should have been – first of all, whether the district court abused its – well, Rule 72A says the district court shall address – shall address timely objections to a magistrate judge's report. You say the magistrate judge reviewed the magistrate judge's own ruling, and that's wrong. But I'm trying to find out what in the world's in this darn file. I don't remember, Your Honor. There wasn't anything significant. We were looking to get a witness to ask about the conversation that they may have had. Nothing significant in the file? I don't remember, Your Honor. You said there's nothing significant in the file. In the file, Your Honor. All right. Now, the witnesses, according to the Ada County Prosecuting Office, to which you issued the subpoena, were long gone, and nobody there knew anything about it. Why didn't you just subpoena the people who were gone? Your Honor, we were told – well, Your Honor, the magistrate judge had said this was not going to be relevant, and so we concluded that it would be useless to do so. You just told me there's nothing significant in the file. What's relevant? The relevant is conversations that people in the prosecutor's office may have had. Did you track those people down and ask them what they were? I did not know, Your Honor. Okay. Thanks. I'm sorry. Go ahead. I have three very brief points to make, if I may. Mr. Naylor said that the jury concluded that Detective Rogers acted reasonably. That's just not true. The jury wasn't asked to assess Detective Rogers – well, it wasn't asked to sign anything on the jury form. There was nothing on the jury form. The jury never found that Detective Rogers acted reasonably. Mr. Naylor made a number of other points concerning the record. All I can say is I ask that you actually look at the record because much of what he said wasn't true. Mr. Hall said that Dr. Rosen's testimony was that Paige Mueller may very well have had a serious bacterial infection. I submit that Dr. Rosen said quite a bit more, and we ask that you look at the record for that. When you asked Mr. Hall what was the reliability of that testimony, he said Dr. Rosen's experience, and that's exactly what Rule 702 prohibits. You can't rely solely on experience for reliable expert testimony. Well, Einstein's theory of relativity equals MC squared. You can't get that in a court anywhere. I'm sorry? I mean, this is the way experts work. They work in an ether with which we are unfamiliar, which is why we allow them in as experts. Yes, Your Honor, but somebody who testifies to E equals MC squared can refer back to learned papers and Einstein's book. What did Dr. Shapiro say? About what? About that. You said, you know, we've heard Dr. Shapiro came in and said Dr. Rosen's wrong. Yes, that's what he said. And on the basis of what did he think Dr. Rosen was wrong? Well, on the basis of... Clinical instinct? No. Dr. Shapiro based his results on his review of the medical records, and specifically the white blood cell count and the urinalysis, both of which were normal, and various studies which showed that when the white blood cell count and urinalysis are normal, there's virtually no chance... What does virtually mean? I don't like... Very, very... Modifiers like virtually. Very small, like less than 1%. Where does the word small appear? Does Shapiro use small? You'll have to... I don't know whether he used small or minuscule or tiny. I don't remember, Your Honor. But he used a word, an adjective that would indicate something very, very low in amount, which would indicate, I think, and support our claim that... I don't quite understand. The word likely is a little difficult. Is it your position that the doctor has to be faced with a likelihood that this baby will have brain damage or death before they could act the way they did? No. Your Honor, it's our position that when the likelihood is so low, as it was in Rogers versus Sanjokin... But how low is low? It isn't 51%, so we're not talking that area. We are talking death and brain damage. We're certainly talking about... If we're talking about something which is less than 1%, don't forget the cure can be worse than the disease. There's always dangers in... Well, how can a spinal tap be worse than death? I don't understand... A spinal tap can't be, but... You say that the treatment itself could be worse than the outcome. That can't be true. The outcome they were worried about was death, not a spinal tap. I just don't know quite how to figure this because you're dealing with something that's an infant. No one disagrees with the possibility of brain damage and death. How much do we as a lawyer or as a judge make that differentiation as distinguished from relying upon the ER experts who have to deal with it? Your Honor, the standard is imminent danger of serious bodily injury and imminent. The element of probability associated with it. Well, the naturopaths seem to think that was a likely possibility. Not after... The mother and Eric, that's why they all decided the safe thing to do was to go to the emergency room in the night. I would submit that not after the white blood cell count and the urinalysis came back, Your Honor. That was prior to that time. And that, of course, is the point, that once the possibility was just a mere possibility, as the courts have really said, it's not sufficient. The mere possibility of danger is insufficient. What did Snyder and Green do that dragged them into the middle of this? They assisted Rogers. They also confined Carissa Mueller. What frame of mind? Their frame of mind... Were they making any decisions at all? Not to my knowledge, Your Honor, but they did assist Detective Rogers, and I assume they made the decision to drag Carissa Mueller down into that specific room and to hold her there. So I would say they made that decision. Why did they have to drag her? Was she resisting? She was resisting for a few feet, and then she walked. Okay, thank you very much, counsel. Thank you, Your Honor. We appreciate the arguments of counsel. This is a very, very difficult case, and I think you've concluded that we've all found it a very difficult case, certainly we on this side of the bench. But we'll have to make the decision. We'll take the case under submission, and we'll try and get a disposition as soon as we can. In the interim, we want to thank the District Court of Idaho for providing these fine quarters for us to hold hearings today, thank counsel for their excellent arguments, and we will now be adjourned. All rise.
judges: Wallace, Trott, Smith